## No. 16,745.

PETERSON ET AL. *v.* COLORADO RIVER WATER
CONSERVATION DISTRICT ET AL.
(254 P. [2d] 422)

Decided January 12, 1953.   Rehearing denied February 24, 1953.

Mr. JOHN B. BARNARD, Mr. JOHN B. BARNARD, JR., for plaintiffs in error.

Mr. FRANK DELANEY, for Colorado River Water Conservation District and Palisade Irrigation District; Mr. LEONARD M. CAMPBELL, Mr. GLENN G. SAUNDERS, for City and County of Denver; Mr. HUGH GILMORE, for Grand County Irrigated Lands Company and Frank C. Black; Mr. FRED VIDEON, Mr. OMER GRIFFIN, for Carl R. Taussig et al., defendants in error.

*En Banc.*

Mr. Justice Stone delivered the opinion of the court.

Plaintiffs, who are plaintiffs in error here, in their complaint alleged that they were the owners of 150 cubic feet of water per second adjudicated to the Williams Fork Ditch, and of certain lands upon which the same was used for irrigation; that defendants were owners of junior water rights and asserted that plaintiffs' said rights had been abandoned; that by virtue thereof the rights, status and legal relations of plaintiffs with regard to their said water rights were uncertain, indefinite and insecure. Wherefore, they prayed for a determination as to the abandonment of said rights. On issue joined and after trial to the court, plaintiffs were denied relief and the court decreed that all of said water right had been abandoned. Since no challenge is raised as to the form of action or its propriety as here employed, we shall not question it, but will consider only the one matter presented to us by the parties; to wit, the issue of abandonment.

In brief, the evidence discloses, without substantial conflict, that the disputed water right was decreed in the year 1906; that the Middle Park Land and Livestock Company was incorporated in 1908 and the various tracts of land, for use on which the water was decreed, were conveyed to said company during the next several years; that work of construction of the ditch was begun about 1902 and some water received through it in 1906; that the ditch crossed very difficult terrain, requiring use of several flumes, a trestle over the river, a tunnel, and an inverted siphon across a canyon. The original full capacity of the ditch apparently was much less than the amount decreed to it. The flumes were constructed of local timber which rapidly shrunk and warped, so that the capacity of the ditch decreased from year to year. The expense and difficulty of repair was great; the timber and wooden flumes gradually collapsed; the siphon pipes went out of service and were washed down

the river or removed for use by neighboring ranchers, and no water has been run through the ditch since the year 1920.

Dated October 15, 1915, a deed of trust was executed by the corporate owners conveying both the land and water rights to the United States National Bank of Denver as trustee, to secure payment of bonds in the aggregate amount of $55,000, which were sold to individual holders. The land and water rights went to foreclosure sale under such deed of trust in the year 1922 and deed thereunder was given to the United States National Bank, as trustee, under date of May 21, 1923. Said trustee conveyed to plaintiff Carl H. Peterson under date of December 30, 1929. In the meantime, the land so conveyed went to tax sale for the years 1920 to 1927 and on April 29, 1929, treasurer's deed issued to Brown and Schrepferman who, January 16, 1930, conveyed their title by special warranty deed to plaintiff.

From the time plaintiff acquired title to the land to the time of bringing this action, there is evidence of various attempts by him to rebuild the ditch and of his being thwarted by financial conditions or inability to obtain materials for construction.

Through the years 1915 to 1920, one Charles F. Black acted as manager of the property for the corporation which owned it and acquired title to 170,000 of its 200,000 shares of corporate stock, with a contract for the purchase of the balance, which, however, never was performed. At the time of the bringing of this action, Black was the owner of other water rights which would be adversely affected by decree favorable to plaintiff; he was named in the action as a defendant, and, by his answer, alleged that plaintiff's water right, here involved, had been abandoned.

Black was the only witness who in any way represented the owner of the property until its loss by foreclosure and tax sale, and the only witness purporting to testify as to intent to abandon. He testified that after

he had been manager and owner of most of the stock of the Middle Park Land and Livestock Company for six and a half years, from 1915 until 1920, some of the flumes had practically collapsed and he was able to get not to exceed 15 or 20 cubic feet of water per second through the pipe; but he did not testify as to the amount of water necessarily diverted at the headgate of the ditch in order to supply this amount, although he stated there was a considerable loss by seepage and leaking of the flumes. The extent of his testimony as to abandonment was as follows: "Q. Going back to your own connection with this company in 1919 or 20, when you left there you owned a major interest in the stock of the company as I understand it? A. Yes, sir. Q. What did you do with this ditch and property, would you explain to the court? A. When I left there? Q. Yes, sir. A. Well, I just cleaned up my personal interest—cattle and stuff, and went off and left it. It was just too big an expense and more of an obligation than an asset to me. Q. And with respect to this ditch what was your intention in regard to the water right? A. Well, I didn't have intention of doing anything with that part of it—I just owned the cattle end of it. Q. As far as the ditch was concerned did you ever intend to do anything with it—repair it or anything? A. No, the ditch was bonded for $55,000 and the delinquent taxes—I couldn't keep it up. Q. Did you make any calculations with respect to expense of repairing or whatever was necessary to make the ditch workable? A. No, it just got too much for the financial part—I couldn't do it. Q. I take it you just went off and left it? A. Yes, sir."

At the close of the trial of the case and agrument by counsel, the court discussed at length his impressions and conclusions from the evidence, in pertinent part as follows:

"I am inclined to regard the corporation and Frank Black at that time as identical. Again resorting to fiction—the law says that the corporation is something

different and apart from the stockholders and owners. But Frank Black was the owner of all the stock in that corporation, except that of Mr. Dawson which was an infinitesimal amount. There isn't anything which he personally could have wanted to do that he couldn't have done by virtue of his majority holding in the ownership of the corporation. He was beset by a bond issue against the land—debts and liens amounting to $55,000. Interest was delinquent, taxes was delinquent—what did he do? He said, 'I could do nothing with it and simply got up and walked away from it.' Those words by Mr. Black upon this trial were to my mind significant. When a person gets up and walks away from a ranch or a piece of property of any kind what he does is abandon it. I don't know that there was evidence of what he said to anybody at that time. I don't recall any statements by Mr. Black at to what was or wasn't his intention. According to his testimony—at least what I got out of it was that he deliberately and intentionally abandoned that water right.

"There are the following seven years to consider. What he actually did in 1920 was abandonment. His conduct for the seven or eight or ten years, while he was still the majority holder of the stock, in point of actual fact the proprietor and owner of the entire plant, shows abandonment. He simply did nothing. There is no explanation except that he didn't consider it a feasible project or a project with which he could accomplish anything of a beneficial character. It is true that his own economic circumstances and conditions were poor throughout those years. Mr. Saunders, I think, stated they were lush years. They were with certain manufacturers, and businesses but were not so lush for the farmers. Nevertheless, we will say that his decision to abandon the property—his decision to walk away and leave it, is accounted for by the circumstances with which he was beset. Perhaps where there is a clear manifest intention to resume operation—to rehabilitate

a plan or project at a later date—the general economic conditions, and the personal financial situation of the ditch owners may negative an intent to abandon. But where there is an actual discontinuance such as here with nothing to show an intent to do otherwise in the future, the conditions shown support and establish the idea of permanent intentional abandonment. He did nothing further with the ranch and the water right— the conditions mentioned support the idea of an intent to abandon rather than repel it.

"The significant period in this case commenced with the year 1920, and terminated with Mr. Peterson's acquisition of his interest. I don't think anything Mr. Schrepferman did or said has any significance one way or the other. * * *

"From then on Mr. Peterson was active. He was continually seeking to do something with this ditch and this water right. Perhaps his efforts were promotional in character, but that doesn't disparage or impugn in any manner with what Mr. Peterson was attempting to do.

"Promotion, development, planning are frequently useful and necessary in projects of this nature, but what he did and attempted to do related to a non-existant water right that had been abandoned during the years 1920 to 1929—from then on it had no existence whatever in fact. If this priority under the doctrine of abandonment had ceased to exist then nothing Mr. Peterson could do would breath life into the corpse of that water right and didn't do it. Therefore, I don't feel it is necessary to discuss to any extent or in detail his activities.

"Mr. Peterson's attempts and actions during 20 years up to the time of the commencement of this suit—if the water right had been abandoned, as was stated in the case cited by Mr. Videon in the Supreme Court—didn't and couldn't revive it or bring it back into being.

"I might if at liberty to follow my personal inclination and choice in this matter, accord to the plaintiffs some water, but I don't think I can do it consistently with

these findings and judgment, nor in conformity with the law and the evidence.

"The court finds and the judgment and order will be that during the period commencing with the year 1920 down to the year 1928—150 cubic feet of water, or whatever was then remaining in the ditch, and whatever amount the owners were entitled to was wholly and intentionally abandoned. I will make a further finding. Probably it is superfluous and is merged in the finding already made. It is that all water in the priority in excess of 24 cubic feet per second of time had been abandoned prior to, and by the year 1920. * * *

"I will ask counsel for defendants to prepare Findings of Fact, and Conclusions of Law and form of decree, embodying these remarks and observations of the court, and also including any other Findings or Conclusions or provisions in the decree which they may deem to be presented by the pleadings and the evidence and properly to be determined by the court in this case. * * *"

Thereafter "Findings of Fact and Conclusions of Law and form of decree," were prepared which did not specifically embody the remarks and observations of the court, as instructed therein, but did specifically contain the following findings: "In the period commencing in 1921 and ending approximately in 1928 there was a complete cessation of use of said water right. During this period there was no manifest intention by anyone having an connection with said water right to resume its use, nor was there any plan to resume such use, even if the numerous difficulties connected with the operation of the water right and the land it was designed to serve could ever be overcome. A person who owned substantially all of the stock of a corporation which owned said water right in this period gave what was, to the trial court, clear and convincing evidence of an intention not to resume the use of said water rights. His was the only evidence of the corporate intention and there was no countervailing evidence nor any adequate evidence of an

excuse for the non-use of the water during this period. The clear evidence is convincing to the Court that the intention not to resume the use of said water right was formed by its owner during this period. Thus, cessation of use was coupled with intent to abandon so that actual abandonment of said water right occurred in the interval from 1921 to approximately 1928. No later activity with respect to said water right could revive it."

We think it appears from these findings of the trial court, that the finding of abandonment upon which the decree rests is based entirely upon the testimony of Black, the manager and principal stockholder of the corporate owner of the land and water rights, to the effect that, with the existing $55,000 mortgage and delinquent taxes, there was involved such a large expense that he couldn't repair the ditch and operate the property, with the result that he removed his cattle and personal property and "just went off and left it." Had the witness Black been the sole owner of the property, that might have been ample evidence of intentional abandonment, but he was not such. Even if we assume that as manager and principal stockholder we could "regard the corporation and Frank Black at the time as identical," as found by the trial court—which is a violent assumption—still, we must consider the rights of the mortgagee. The equity owner can have no more right to invade the security of the mortgage by such express abandonment of a water right constituting a substantial part of the security without the knowledge or acquiescence of his mortgagee than by sale of the right. Here, the mortgage was in the form of a deed of trust to a national bank, as trustee, to secure an issue of bonds held by numerous parties and the water right was a substantial part of the security. The mortgagee started foreclosure within two years after Black's act of abandonment. There is no finding of the trial court as to acquiescence by the mortgagee in the abandonment of whatever water right existed at the time of the execu-

tion of the mortgage or as to such continued period of nonuse as to result in abandonment by implication. The court erred in finding that the action of Black in the absence of such other finding constituted an abandonment of the water right hostile to the rights of the mortgagee.

It appears from the record that at no time has the ditch had capacity to carry the full amount of the 150 feet decreed to it, and the patent failure through many years to attempt or prepare to divert and use at any time this full amount would constitute abandonment of the amount in excess of the maximum diversion.

The judgment of the court below must be reversed, and the case remanded with instruction to the trial court to find and determine on the evidence now before it, or further evidence if desired, what part of said water right has been abandoned, as indicated by insufficiency of diversion works at any time to carry the full amount of the decree for use, and further, to determine whether all or any part of said right has been otherwise abandoned.

Judgment reversed and case remanded for further proceedings not inconsistent herewith.